880 So.2d 903 (2004)
STATE of Louisiana
v.
Floyd FALKINS and Dwayne Simms.
No. 04-KA-250.
Court of Appeal of Louisiana, Fifth Circuit.
July 27, 2004.
*906 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Anne Wallis, Vincent Paciera, Kia M. Habisreitinger, Assistant District Attorneys, Twenty-Fourth Judicial District Parish of Jefferson, Gretna, LA, Bruce G. Whittaker, New Orleans, LA, for Defendant/Appellant.
Dwayne Simms, Louisiana State Penitentiary, Angola, LA, in Proper Person.
Panel composed of Judges EDWARD A. DUFRESNE, JR., CLARENCE E. McMANUS and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.

STATEMENT OF THE CASE
On November 3, 2000, the Jefferson Parish District Attorney filed a bill of information charging defendants, Floyd Falkins and Dwayne Simms, with four counts of armed robbery in violation of LSA-R.S. 14:64.[1] Defendants were arraigned on November 6, 2000 and pled not guilty. On December 18 and 19, 2002, the case was tried before a twelve-person jury which found both defendants guilty as charged.
The trial court sentenced both defendants on January 10, 2003 to imprisonment at hard labor for ninety-nine years on each count without benefit of parole, probation, or suspension of sentence, with the sentences to run concurrently. Defendants' oral motions to reconsider sentence were denied.
The State filed multiple offender bills of information alleging both defendants to be third felony offenders. However, at the multiple bill hearing, the State indicated that it was alleging that defendants were only second felony offenders for multiple bill purposes. Defendants denied the allegations of the multiple bills.
At a hearing on April 1, 2003, the trial court found both defendants to be second felony offenders, vacated their original sentences on count one, and sentenced both defendants under the multiple bill statute to imprisonment at hard labor for 110 years to run concurrently with their original sentences on counts two, three, and four. He ordered defendant Simms' enhanced sentence to be served without benefit of parole, probation, or suspension of sentence.[2] Defendants orally objected to the sentences. In January of 2003, both *907 defendants filed motions for appeal that were granted.

FACTS
At trial, the State introduced evidence to show that, on October 19, 2000, at approximately 9:15 a.m., defendant, Floyd Falkins, along with Larry Simms, walked into the Hibernia National Bank (Hibernia) at 4601 Westbank Expressway in Marrero and robbed four tellers while armed with guns. The State also introduced evidence to show that, after the robbery, Falkins and Simms got into a vehicle being driven by defendant, Dwayne Simms, and they fled the scene.
Kenyatta Bush, a teller at Hibernia, testified that she worked at station number four behind the teller counter in the bank. As she was processing ATM deposits, she suddenly heard a loud noise at the front door. Two men entered the bank and said, "Okay, everybody get down on the fing floor." Ms. Bush complied, lying down on the floor in the walkway between stations numbers two and three. She subsequently heard another loud noise and saw one of the men jump over the counter and through her window. He went directly to station number two and got some money from that teller. He then went to station number one.
When Ms. Bush saw the man at station number one, she scooted back and pressed the holdup button. At that time, Ms. Bush was in station number three with another teller, Betty Higgins. The man subsequently came to station number three and demanded money from Ms. Higgins. After he got all of Ms. Higgins' money, the man in the lobby said, "Come on, let's ride," and the man behind the counter jumped back over the counter and left. Ms. Bush testified that, during the robbery, she saw guns. She explained that the man who jumped over the counter wore a dark sweat shirt, either black or dark gray, and that she could not see his face because it was covered.
Mary Domingue and Betty Higgins, who were bank tellers, Virginia Keller, who was a customer service representative, and Dianne Fennidy, who was a branch manager, also testified at trial, and their testimony largely corroborated that of Ms. Bush. Additionally, Ms. Higgins testified that the money the robber took from her included a "dye pack." She further testified that the robber who did not jump over the counter wore a bandanna and a light gray sweat shirt, which she identified in court.
Witness Sylvia Bourg testified that she waited in her car while her daughter went into Hibernia to cash a check. Ms. Bourg subsequently got out of the car because her daughter was gone for so long. When Ms. Bourg walked up to the bank, she realized something was wrong. She observed two black males "coming up" wearing sweat shirts and hats, even though it was a warm day. She testified that one of the men wore a gray sweat shirt with a hood, and the other man wore something black with a hat over his head.
Ms. Bourg observed them walking fast, and one of the men had a bag in his hand with red smoke coming out of it. She explained that the two men started to run after the red smoke came out of the bag. Ms. Bourg was unable to get a good look at their faces, but she saw them go toward Rite Aid and down toward the other end of the strip shopping center.
Witness Jean D. Pierre testified that she was in the Rite Aid parking lot with her son and daughter when she observed two men coming from Hibernia toward the Rite Aid parking lot. Ms. Pierre turned to her daughter and said that it looked like those men had robbed the bank, so she continued watching them.
*908 Ms. Pierre explained that one of the men dropped something with red and white smoke coming from it on the neutral ground and then right in front of Rite Aid. After the men passed Rite Aid, they picked up their pace. She saw the men go to the parking lot behind Rite Aid, get into a burgundy Maxima, and flee. When the two men got in the vehicle, there was someone sitting in the driver's seat and the car was stopped at an angle, waiting and ready to go with the back doors open. Ms. Pierre explained that the driver of the burgundy car turned onto Avenue D and then made a left turn onto the expressway.
Ms. Pierre told her daughter to write down the license plate number, JCP 866,[3] which her daughter wrote down on the back of a napkin. Ms. Pierre identified a photograph of the car in court. She could not see the faces of the two men who came from the bank; however, she testified that one of the men was wearing a black sweat jacket and the other man was wearing a light gray sweat jacket with a hood. She stated that one of the men was wearing something over his face, but the other man was not.
Jefferson Parish Sheriff's Office (JPSO) Sergeant Chad Gauthreaux testified that he responded to a bank robbery call at Hibernia. He obtained a description of the two men from branch manager Dianne Fennidy and broadcast that description over the radio: suspect number one was a black male, 5'10", thin build, late teens or early 20's, wearing a gray hooded sweat shirt with the hood pulled over his head; and suspect number two was a black male, tall, thin build, late teens or early 20's, with a black cloth or rag covering the top of his head.
JPSO Deputy George Giron testified that he received information over the radio that two men had robbed the Hibernia bank, fled in a red Maxima with license plate number JGP 846, and were traveling eastbound on the elevated portion of the expressway. Deputy Giron and his partner went to Stumpf Boulevard, stopped at the high rise, and waited to see if that car passed. Deputy Giron subsequently noticed a red Maxima occupied by three black males with a similar license plate number. He testified that the license plate number was not an exact match, but it was close.
Deputy Giron and his partner pulled the vehicle over and ordered the driver out of the vehicle. The driver exited the vehicle and then returned into the vehicle. They again ordered the driver out of the vehicle. After he got out, they ordered him to the rear of the vehicle. Instead, the driver walked to the front of the vehicle. Assuming that the driver could not hear him because of the traffic, Deputy Giron went to get his public address system out of his car. At that point, the driver jumped over the side of the elevated expressway, which he estimated was 25 to 30 feet above the ground.
Deputy Giron went around to the front of the Maxima and observed two men still in the vehicle, a front passenger and a rear right passenger. He ordered the two men out of the vehicle, placed them on the ground, secured them with handcuffs, and placed them in separate vehicles. The officers conducted a visual cursory search of the vehicle and saw a handgun protruding from underneath the front passenger seat, gloves, sunglasses, and bandannas. The officers also saw a black bag and a dark gray sweat shirt in the back seat.
Deputy Giron testified that Dwayne Simms was later identified as the driver, Larry Simms as the front seat passenger, *909 and Floyd Falkins as the back seat passenger. He subsequently learned that the three men were brothers. Deputy Giron identified a photograph of the vehicle and stated that the license plate on the vehicle was JGP866. He ran the license plate which showed that it was registered to Dwayne Simms.
JPSO Detective John Carroll testified that the following items were recovered from the burgundy Maxima: a .22 caliber black semiautomatic handgun located on the floorboard of the front passenger seat; a 15 round .22 caliber magazine; twelve.22 caliber live rounds; a black .357 Magnum revolver located on the rear passenger floorboard; three Winchester .38 special rounds; three .357 hollow point rounds; sunglasses; one pair of brown cloth gloves; one pair of greenish brown cloth gloves; a black knit ski mask; a red bandanna; a black nylon bag with red dye on the inside; $15,839 in U.S. currency;[4] three security dye packs; and one dark blue Adidas brand hooded sweat shirt located on the driver's floorboard.
Penny Falkins, who was called as a witness by the defense, testified that Floyd Falkins was her husband, and that in October of 2000, he was under the care of doctors because he had been in an automobile accident. Mrs. Falkins explained that her husband had hurt his back and knee, that she brought him to see the doctor twice a week, that he was on medication, and that he was fifty-one years old.

DISCUSSION
In their first assignment of error, both defendants argue that the evidence was legally insufficient to support the verdict on count one, the armed robbery of Lorna Moore. They contend that there was no evidence to prove that Ms. Moore was the victim of an armed robbery, because Ms. Moore did not testify at trial and her name was not mentioned by the other witnesses. The State responds that the evidence was sufficient to support the conviction on count one. It argues that, although Ms. Moore did not testify, three of the other tellers did testify as eyewitnesses to the offense against Ms. Moore.
The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 82. When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Captville, 448 So.2d 676, 678 (La.1984). This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208. When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982).
*910 LSA-R.S. 14:64 defines armed robbery as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."
In the instant case, Mary Domingue testified that Lorna Moore was a teller on the day of the robbery, and that Ms. Moore's station was right next to hers. She identified Ms. Moore's station as station number two. Ms. Domingue heard one of the robbers order her and the other tellers to unlock their drawers and surrender their money. Betty Higgins testified that one of the men robbed window number two. Kenyatta Bush testified that, when the robber told them to get on the ground, she landed between windows two and three. She explained that, as soon as the robber came behind the teller counter, he went directly to window two and "got some money from her...." Each teller testified that the robbers had guns.
In State v. Banks, 96-652 (La.App. 5 Cir. 1/15/97), 694 So.2d 401, 410-411, cited by both the State and the defendants, Dwight Dedeaux, the alleged armed robbery victim, did not testify at defendant's trial. However, the other victim testified that defendant and his companions took something of value, a jacket, from Mr. Dedeaux, by use of force or intimidation, while armed with a gun. Another eyewitness to the robberies testified that defendant and the other perpetrators took property from Mr. Dedeaux. Sergeant Thornton identified a photograph of the back seat of a jeep depicting a gray coat lying on the rear seat. He testified that the coat belonged to Mr. Dedeaux, and another witness identified the coat in the photograph as the one taken from Mr. Dedeaux. This Court concluded that the testimony of the witnesses was sufficient to establish that defendant committed the armed robbery of Mr. Dedeaux.
In the present matter, although Ms. Moore did not testify, the testimony of Ms. Domingue, Ms. Higgins, and Ms. Bush, revealed that one of the robbers took money from Ms. Moore, as well as the other tellers. Accordingly, we find that the State presented sufficient evidence to establish that defendants committed armed robbery of Lorna Moore, and this assignment of error is without merit.
In defendants' second assignment of error, they argue that their sentences on count one are illegal and excessive, because their convictions on count one were based upon insufficient evidence. The State responds that the sentences on count one are within the statutory guidelines and are based on a valid statute, bill of information, and verdict. Therefore, the State contends that the sentences are legal.
In view of our finding that the evidence was sufficient to support defendants' convictions on count one, the defendants' argument that their sentences on count one are based on invalid convictions is without merit. We note that the issue of whether the sentences on count one are excessive is addressed in defendants' third assignment of error.
In their third assignment of error, defendants challenge their original sentences on all counts and their enhanced sentences on count one, arguing that they are excessive. They contend that they did not deserve the maximum sentences, because none of the alleged victims was harmed. The State responds that the record supports the sentences imposed and therefore, they should not be disturbed on appeal.
Defendants orally moved for reconsideration of sentence after the original sentencing on all four counts; however, they did not state the specific grounds on which *911 the motions were based, nor did they file written motions to reconsider sentence. Defendants orally objected to their enhanced sentences on count one; however, they did not file written motions to reconsider sentence.
The failure to file a motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a bare review of the sentence for constitutional excessiveness. State v. Hester, 99-426 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 103, writ denied, 99-3217 (La.4/20/00), 760 So.2d 342. Accordingly, defendants' sentences are examined only for constitutional excessiveness.
The Eighth Amendment to the United States Constitution and Article I, Section 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Even a sentence within the prescribed statutory limit may violate a defendant's constitutional right against excessive punishment. State v. Sweeney, 443 So.2d 522, 531 (La.1983); State v. Jones, 98-1055 (La.App. 5 Cir. 2/23/99), 729 So.2d 95, 97. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La. 1992); State v. Munoz, 575 So.2d 848, 851 (La.App. 5 Cir.1991), writ denied, 577 So.2d 1009 (La.1991). In reviewing a sentence for excessiveness, the appellate court must consider the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice. State v. Daigle, 96-782 (La.App. 5 Cir. 1/28/97), 688 So.2d 158, 159, writ denied, 97-0597 (La.9/5/97), 700 So.2d 506.
Generally, maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender. State v. Quebedeaux, 424 So.2d 1009, 1014 (La. 1982), aff'd on remand, 446 So.2d 1210 (La.1984). However, the trial judge is afforded wide discretion in determining a sentence, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Jones, 98-1055 (La.App. 5 Cir. 2/23/99), 729 So.2d 95, 97. This Court should further consider three factors in reviewing a judge's sentencing discretion: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Telsee, 425 So.2d 1251 (La.1983); State v. Slang, 94-332 (La.App. 5 Cir. 11/16/94), 646 So.2d 1037, 1041, writ denied, 94-3063 (La.4/7/95), 652 So.2d 1344.
Defendants were convicted of four counts of armed robbery. The sentencing range for the crime of armed robbery is set out in LSA-R.S. 14:64(B) which provides that:
Whoever commits the crime of armed robbery shall be imprisoned at hard labor for not less than ten years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence.
Prior to sentencing, the trial judge stated:
The Court imposes the following sentence and let it be said that as I've said before here, armed robberies, in my opinion, are only a small step away from a murder. If someone uses a weapon, in this case they used firearms to commit a robbery, it's not going to be tolerated by this Court and my sentence is going to reflect the severity of what these two defendants did. And I've looked closely at their criminal history, their conduct and the case as it was proven at trial.
*912 The trial judge subsequently sentenced defendants to the maximum sentence of ninety-nine years on each count without benefit of parole, probation or suspension of sentence, to run concurrently.
The trial court later found defendants to be second felony offenders. Under the multiple bill statute, the sentencing range for second felony offenders with underlying convictions for armed robbery is 49½ years to 198 years. LSA-R.S. 15:529.1(A)(2)(a); LSA-R.S. 14:64. The trial judge vacated the sentences on count one and re-sentenced defendants under the multiple bill statute to imprisonment at hard labor for 110 years, to run concurrently with the ninety-nine-year original sentences on counts two, three, and four.
A review of the jurisprudence reveals that ninety-nine-year sentences imposed upon defendants convicted of armed robbery have been previously upheld in many cases, including cases in which the victims were not physically injured. See State v. Dempsey, 02-1867 (La.App. 4 Cir. 4/2/03), 844 So.2d 1037; State v. Douglas, 389 So.2d 1263 (La.1980); State v. Williams, 482 So.2d 1090 (La.App. 3 Cir.1986); State v. James, 545 So.2d 560 (La.App. 4 Cir. 1989), writ denied, 551 So.2d 618 (La. 1989); State v. Carter, 570 So.2d 234 (La. App. 5 Cir.1990); and State v. Wilson, 452 So.2d 773 (La.App. 4 Cir.1984).
In the instant case, the trial court imposed a 110-year enhanced sentence upon both defendants on count one, to run concurrently with the ninety-nine-year sentences on counts two, three, and four. This Court and other courts have upheld similar sentences for defendants who were convicted of armed robbery and subsequently found to be second felony offenders. See State v. McNeal, 99-1265 (La. App. 4 Cir. 6/14/00), 765 So.2d 1113, writ denied, 00-2134 (La.9/28/01), 797 So.2d 684; State v. Freeman, 00-238 (La.App. 3 Cir. 10/11/00), 770 So.2d 482, writ denied, 00-3101 (La.10/5/01), 798 So.2d 963; State v. Doleman, 02-957 (La.App. 4 Cir. 12/4/02), 835 So.2d 850, writ denied, 02-3101 (La.9/19/03), 853 So.2d 633; and State v. Redditt, 03-354 (La.App. 5 Cir. 10/28/03), 868 So.2d 704, writ denied, 03-3484 (La.4/8/04), 870 So.2d 268.
In the instant case, defendant Falkins and Larry Simms walked into the bank with guns, cursing and yelling at everyone to get on the floor, and subsequently robbed four tellers of approximately $20,000,[5] thereby creating the risk of death and great bodily harm to approximately ten bank employees and customers who were in the bank at the time of the robbery. Defendant Simms waited in the car outside, ready to drive away, and drove off when defendant Falkins and Larry Simms got in the car. Additionally, defendant Falkins had two prior armed robbery convictions, and defendant Simms had two prior convictions, one for armed robbery and one for attempted carrying of an illegal weapon by a convicted felon, which shows a propensity for felonious behavior. In light of the circumstances surrounding the armed robberies, defendants' extensive and violent criminal records, and other sentences imposed by this Court and other courts on defendants similarly situated, we find that the trial court did not abuse its discretion in sentencing, because the sentences on counts one through four are not constitutionally excessive. Accordingly, this assignment of error is without merit.
*913 Defendant Simms filed a pro se brief on his own behalf, in addition to the brief filed by counsel on behalf of both defendants. In his pro se brief, defendant Simms argues that the guilty verdicts as to four counts of armed robbery resulting from a single incident are contrary to law, and the evidence presented by the State was insufficient to support his conviction as a principal to armed robbery. He contends that there was no evidence to suggest that he had any knowledge that the two perpetrators were going to commit an armed robbery or that they had committed an armed robbery. He further contends that there was no direct testimony, the circumstantial evidence was weak and contained inconsistencies, his mere presence was insufficient to support the verdict, and that at most he could only be found guilty of accessory after the fact.
A principal is any person concerned in the commission of a crime, whether present or absent, and whether he directly commits the offense, aids and abets in its commission, or directly or indirectly counsels or procures another to commit the crime. LSA-R.S. 14:24. A person who aids and abets another in a crime is liable just as the person who directly commits it, although he may be convicted of a higher or lower degree of the crime, depending on the mental element proved at trial. State v. Watson, 397 So.2d 1337 (La.1981), cert. denied, 454 U.S. 903, 102 S.Ct. 410, 70 L.Ed.2d 222 (1981).
Only those persons who knowingly participate in the planning or execution of a crime are principals. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, 428. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. State v. Pierre, supra. Though intent is a question of fact, it may be inferred from the circumstances. State v. Kahey, 436 So.2d 475, 488 (La.1983). Flight and attempt to avoid apprehension are circumstances from which the jury may infer guilty conscience. State v. Fuller, 418 So.2d 591, 593 (La.1982).
In several cases, this Court has found that the evidence was sufficient to establish that defendant was a principal to armed robbery when he acted as the driver of the getaway vehicle. In State v. Saylor, 01-451 (La.App. 5 Cir. 11/27/01), 802 So.2d 937, writ denied, 01-3406 (La.10/4/02), 826 So.2d 1122, juvenile J.B. was walking near his home when a black Dodge Neon occupied by two black males pulled up alongside him. The passenger in the Dodge jumped out of the vehicle with a gun, placed it at the victim's head, and demanded money. J.B. only had a key ring, which he gave to the robber. The vehicle drove away, and J.B. was able to see the license plate.
Defendant, the driver of the vehicle, was convicted of armed robbery. The victim testified that defendant transported the gunman to and from the scene, that defendant appeared to keep watch during the commission of the crime, and that defendant took no actions to prevent the crime. This Court stated that the factfinders could have reasonably inferred that defendant had the requisite intent to commit the crime in that he aided its commission by acting as the lookout and driver of the getaway car. This Court concluded that a rational trier of fact could have found that the State proved beyond a reasonable doubt that defendant was a principal to armed robbery.
In State v. Jackson, 99-1256 (La.App. 5 Cir. 7/25/00), 767 So.2d 848, two co-defendants entered an apartment wearing disguises, pointed handguns at twelve to fourteen women who were playing cards, and demanded money. The two men took money and jewelry and left. Defendant, *914 the driver of the vehicle, the two co-defendants and a fourth man split the stolen cash. After dropping off one of the co-defendants, the remaining three men were involved in a high-speed chase with the sheriff's office. The three men abandoned the car and fled on foot. Defendant was later arrested. The two co-defendants turned themselves in and gave recorded statements indicating that defendant was not only involved in the robbery, but that he planned it and gave them weapons.
Defendant was convicted of eight counts of armed robbery. This Court concluded that the evidence was sufficient to support defendant's convictions for seven counts of armed robbery, noting that defendant was the driver of the getaway car and was involved in the crime. It stated that, although defendant did not actually participate in the armed robbery, he was a principal to the action.
In the present case, during the robbery, defendant waited for Simms and Falkins in his vehicle which he parked away from the bank in a parking lot near Rite Aid. The record further indicates that the vehicle was sitting at an angle "waiting and ready to go" with the back doors open.
Following the robbery, two men were seen walking fast toward Rite Aid, one of whom had a bag in his hand with red smoke coming out of it. The two men, one of whom was wearing a mask or hood, subsequently entered the parked vehicle, and defendant immediately drove away from the scene. After the police pulled the vehicle over, defendant got out and attempted to escape by jumping over the side of the expressway. Numerous items of physical evidence found in the vehicle linked defendant to the armed robbery, including, but not limited to, a black bag with red dye on the inside containing the money stolen from the bank, two guns fitting the victims' descriptions along with ammunition, a black knit ski mask, and a hooded sweat shirt.
The defendant argues that there was no evidence to suggest that he knew the perpetrators were going to commit an armed robbery or that they had committed an armed robbery. However, the record shows that the factfinders could have reasonably believed that defendant knew Simms and Falkins were going into the bank to rob it. Simms did not park in front of the bank, but rather away from the bank with the back doors open, and he drove away immediately after the two men got into the vehicle. A gun was found in the front of the vehicle indicating that defendant was a conscious participant whose role in the crime was to drive the getaway car. Additionally, the record indicates that Simms and Falkins were not strangers to defendant, but were in fact, his brothers. Based on the foregoing, the factfinders could have reasonably inferred that defendant had the requisite intent to commit the crime in that he aided its commission by acting as the driver of the getaway car. Accordingly, we find that the evidence was sufficient to prove beyond a reasonable doubt that defendant was guilty as a principal to armed robbery, and the first error asserted by defendant Simms in his pro se brief is without merit.
In the second and final argument raised by defendant Simms in his pro se brief, he argues that the trial court erred by denying his motion for a mistrial and in overruling the objection made by defense counsel during closing argument. He contends that the prosecutor's closing argument was improper, prejudicial, and in violation of LSA-C.Cr.P. art. 774, because the prosecutor implied that the defense had a duty to adduce testimony from a witness at the doctor's office, and because the prosecutor implied that he had excluded any hypothesis *915 of innocence as to why defendant attempted to flee from the arresting officer.
The first exchange at issue occurred during the state's rebuttal argument as follows:
MR. PACIERA [The prosecutor]:
And, no matter how hard Mr. Regan tried to get her to say it, that car wasn't parked in front of a doctor's office, it was parked on a sidewalk in a totally illogical place where it would have been in the way. And, if it had been there for him to go in the doctor's office, why didn't you hear somebody from the doctor's office come here and say, oh, yeah, Mr. Simms had a doctor's visit that day?
MR. REGAN [Defense counsel]:
Judge, there's an objection at this point. May we approach the Bench?
MR. PACIERA:
I will say that they don't have that duty.
THE COURT:
Let him stateCome to the Bench and let him state his objection.
(THE FOLLOWING IS A CONFERENCE AT THE BENCH.)
MR. REGAN:
The objection is that counsel cannot suggest the defendant should call witnesses at this point. I did not put on a case, there were no witnesses to put on, and for counsel to suggest I should have called the doctor or anybody else is improper. I object, and I move for a mistrial.
MR. PACIERA:
And I will tell the jury at this point that they don't have a duty to put on any evidence, any witnesses, and they can't hold it against them, but they're asked to use their common sense.
MR. REGAN:
The damage is already done, Your Honor.
THE COURT:
I'm going to deny the motion for a mistrial. But I'm going to ask Mr. Paciera to make that statement.
MR. PACIERA:
Yes, Your Honor.
MR. REGAN:
Your Honor, I would ask, and the trilogy requires me to ask, that the Judge instruct the jury that they're to disregard that argument and advise. Not Mr. Paciera but the Court should advise them now that that's improper, and there's no burden on the defendant to call witnesses.
MR. PACIERA:
And my close was interrupted, and I would like to be able to do it for my own continuity.
THE COURT:
Step back.
(END OF BENCH CONFERENCE)
THE COURT:
I'm going to deny the motion request, but I'm going to sustain the objection to the statements. And I just want the jury to be aware of one thing before Mr. Paciera continues with his closing argument, that under the law as I instruct youand I will do it again in a minutethe defendants are not required by law to call any witnesses or produce any evidence. Okay?
Let's continue.
The second exchange at issue also occurred during the state's rebuttal argument:
MR. PACIERA:
And what did Dwayne Simms do when he got caught? First off, he refused to cooperate when the officer told him to get out of the car and come to the police *916 car. He got back in his car, then got out, and, instead of coming back to the police car when he was ordered to do so, he walked to the front of the car and then jumped over. Is that the action of an innocent person? Obviously not.
There is a photograph hereOh, because one of the things that Mr. Regan said was something about a gun being pointed at his client. Well, I'm not sure what trial he was in, but the trial that took place in this courtroom had no such testimony that
MR. REGAN:
Excuse me. Judge, I do object. He has to argue from the Record. He said his partner pulled his gun. I object to counsel arguing unless it's from the Record.
THE COURT:
I overrule the objection.
MR. REGAN:
Note my objection.
THE COURT:
The jury is to rely uponthe jury heard the testimony, they heard the evidence, and they're going to be able to rely upon their memories as to what was produced at trial.
LSA-C.Cr.P. art. 774 provides that the scope of closing argument must be limited to the evidence admitted, the lack of evidence, conclusions of fact therefrom and the law applicable to the case. This article further states that the argument shall not appeal to prejudice, and the State's rebuttal argument shall be confined to answering the argument of the defendant. However, even if closing arguments go beyond the scope of LSA-C.Cr.P. art. 774, the errors are harmless unless the reviewing court is thoroughly convinced that the remarks influenced the jury and contributed to the verdict. State v. Clemons, 01-1032 (La.App. 5 Cir. 2/26/02), 811 So.2d 1047, 1050, writ denied, 02-866 (La.11/22/02), 834 So.2d 972, cert. denied, 538 U.S. 1063, 123 S.Ct. 2228, 155 L.Ed.2d 1117 (2003).
The law regarding mandatory mistrials is set forth in LSA-C.Cr.P. art. 770, and the law regarding discretionary mistrials and admonitions is set forth in LSA-C.Cr.P. art. 771.
LSA-C.Cr.P. art. 771 provides as follows:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
A mistrial is a drastic remedy and, except in instances in which it is mandatory, a mistrial is warranted only when trial error results in substantial prejudice to the defendant, depriving him of a reasonable expectation of a fair trial. State v. Ballay, 99-906 (La.App. 5 Cir. 2/29/00), 757 So.2d 115, 126, writ denied, 00-0908 (La.4/20/01), 790 So.2d 13. *917 Whether a mistrial should be granted is within the sound discretion of the trial court, and denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion. Id.
With regard to the first exchange at issue, the prosecutor's comment that the defense failed to call a witness from the doctor's office did not warrant a mistrial. The record indicates that defense counsel suggested during the cross-examination of Ms. Pierre that defendant was parked in front of the doctor's office because he had been inside of that office. During rebuttal, the prosecutor's comment about the defense's failure to call a witness from the doctor's office was simply a response to that suggestion. Further, defense counsel requested an admonition following those comments, pursuant to LSA-C.Cr.P. art. 771, which was given by the trial judge when he informed the jury that the defendant had no duty to call witnesses. Also, the trial judge instructed the jury that the statements and arguments of counsel were not evidence. After reading the argument as a whole and considering the entirety of the record, we do not find that the prosecutor's statements regarding the defense's failure to call a witness were sufficient to influence the jury's verdict. Accordingly, the trial court did not err in failing to grant a mistrial.
With respect to the second exchange at issue, regarding the prosecutor's comments about the gun during rebuttal argument, the record indicates that defense counsel argued during closing argument that defendant jumped over the side of the expressway when the police pulled the gun on him and his co-defendants. Thus, the prosecutor's rebuttal argument was properly confined to answering the argument of the defendant. LSA-C.Cr.P. art. 774. However, it appears that the prosecutor was incorrect when he stated during rebuttal argument that there was no testimony that a gun was being pointed at defendant. During the cross-examination of Deputy Giron, the deputy testified that, although he did not have his weapon out when he ordered defendant out of the vehicle, his partner did. Deputy Giron further explained that, at the time defendant jumped over the rail, the weapon had been drawn.
Although defense counsel objected to the prosecutor's comment that there was no such testimony, he did not move for a mistrial or request an admonition. However, the trial judge gave an admonition anyway, stating that the jurors were to rely upon their memories as to the evidence and testimony that was introduced at trial. Further, as was noted above, the trial judge instructed the jury that statements and arguments of counsel were not evidence. Thus, considering the strong circumstantial evidence and the trial judge's admonition and instruction to the jury, it is clear that the comments regarding the gun did not influence the jury or contribute to the verdict. Accordingly, we find that the prosecutor's comments regarding the gun were harmless, and this assignment of error is without merit.
In their fourth assignment of error, the defendants ask this Court to review the record for errors patent. The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920: State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review did not reveal any errors that require corrective action by this Court.

DECREE
For the reasons set forth above, we affirm the defendants' convictions and sentences.
AFFIRMED.
NOTES
[1] A third defendant, Larry Simms, was also charged with four counts of armed robbery in the bill of information; however, he is not a party to this appeal.
[2] The trial judge did not impose Falkins' enhanced sentence without benefit of parole, probation, or suspension of sentence, though Falkins' sentence as a habitual offender based on an underlying conviction of armed robbery should be without parole, probation, or suspension of sentence. Nevertheless, this error does not require any action by this Court because LSA-R.S. 15:301.1(C), as interpreted by State v. Williams, 00-1725 (La.11/29/01), 800 So.2d 790, 799, imposes these restrictions by operation of law. State v. Esteen, 01-879 (La.App. 5 Cir. 5/15/02), 821 So.2d 60, 79, writ denied, 02-1540 (La.12/13/02), 831 So.2d 983.
[3] The correct license plate number was actually "JGP 866."
[4] Det. Carroll identified a photograph of the currency removed from the vehicle. The photograph shows that the currency was covered with red dye.
[5] Ms. Domingue testified that the amount of money taken in the robbery was a little less than $20,858, and that all of the money taken in the robbery was not recovered. As stated previously, Det. Carroll testified that $15,839 was found in the back of Dwayne Simms' vehicle.