924 So.2d 1096 (2006)
STATE of Louisiana
v.
Andre B. DAVIS.
No. 05-KA-733.
Court of Appeal of Louisiana, Fifth Circuit.
February 27, 2006.
*1098 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Anne Wallis, Kia M. Habisreitinger, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Holli Herrle-Castillo, Louisiana Appellate Project, Marrero, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., MARION F. EDWARDS, and CLARENCE E. McMANUS.
EDWARD A. DUFRESNE, JR., Chief Judge.
On June 8, 2000, the Jefferson Parish Grand Jury issued an indictment charging defendant, Andre Davis, with second degree murder, in violation of LSA-R.S. 14:30.1. At the arraignment, defendant pled not guilty.[1]
*1099 The matter thereafter proceeded to trial before a twelve person jury on December 6, 2004. After considering the evidence presented, the jury, on December 10, 2004, returned a unanimous verdict of guilty as charged. Defendant filed a motion for new trial on January 10, 2005. On the same day, the trial court heard arguments on the motion, and denied it. Defendant waived statutory delays, and the court sentenced him to the mandatory term of life imprisonment without benefit of parole, probation, or suspension of sentence. Defendant now appeals.

FACTS
The victim, Mark Davis, was stabbed to death in his apartment on April 18, 2000. There were no eyewitnesses to this murder.
At trial, Tamara Davis testified that in April of 2000, she was married to the victim, Mark Davis. The two were living separately, but were making an attempt at reconciliation. Tamara also testified that during her separation, she was involved in a romantic relationship with defendant, Andre Davis, for about a year. When she decided to reconcile with Mark, Tamara resolved not to see defendant any longer.
On the night before the murder, defendant showed up at Mark's apartment and asked to see Tamara who was spending the night there. Defendant asked Tamara whether he could use her car[2] to get onto the naval base. Tamara told him he could not, and defendant left. Three to five minutes later, defendant knocked on the apartment door again and asked for Tamara. She went outside to speak with him. Defendant grabbed her by the back of the neck and told her that if he did not get what was due him, he would have to kill her. Tamara testified that defendant did not specifically ask her for money, nor did she owe him any. Mark went outside and told defendant, "Bro, make this the last time that you come over here." Tamara and Mark went inside and went to bed.
When Tamara woke up the next morning, she left the apartment to go to work. She attempted to call Mark several times that day, but was unable to contact him. When she had not heard from Mark by the following morning, Tamara went to his apartment to check on him. When Tamara entered the apartment, she saw Mark lying on the floor, dead. He was dressed only in black shorts, and she could see he had suffered severe stab wounds.
Tamara immediately left Mark's apartment and went to the nearby home of her friends, Sheryl and Garth Miles. She found Sheryl there with defendant and Marcel Morton. Tamara noted that the shirt defendant was wearing was one she had bought for Mark. Tamara told Sheryl that Mark was dead, and that defendant had killed him. Tamara then took Sheryl and Marcel with her to Mark's apartment. She testified that one of them telephoned 911, and an ambulance and police officers responded.
Deputy Mark Soileau of the Jefferson Parish Sheriff's Office testified that he responded to the call. Upon arrival, Officer Soileau saw the victim lying on the floor with numerous stab wounds. Soileau met with Sheryl Miles, who told him she lived nearby, and that the man whom she suspected of having killed the victim was at her apartment.
Detective Joseph Ortego testified that he canvassed the apartment complex in search of a weapon. He located a knife *1100 with blood on it inside a Capri Sun drink box in a laundry room trash can. This laundry room was located about two hundred feet from the murder scene.
Lieutenant Don English, the supervising officer at the murder scene, testified that the entryway floor was coated with blood, as were the entry door and the wall behind it. There was also blood on some of the furniture. English testified that specimens of the blood were collected and sent for analysis. English observed that the victim's bedroom had been ransacked, and there were clothes thrown on the floor. Boxes of Capri Sun similar to the one in which the knife was found were discovered in the victim's kitchen cabinets.
English testified that after speaking to witnesses, he developed defendant as a suspect. Defendant was found and arrested about one hundred yards from the murder scene. English said defendant had lacerations on his hands and arms. English obtained a search warrant, and a swab was taken of the inside of defendant's mouth and sent for DNA testing. Samples of DNA evidence were also collected from seven different locations in the apartment.
Garth Miles testified defendant stayed at his family's apartment the two nights prior to the discovery of the victim's body. He further testified that he and his wife own a set of kitchen knives, which they keep in a butcher block in their kitchen. He stated that State's Exhibit 7, the knife seized near the murder scene, resembled the knives in his set. It had the same brand name as his knife set. Garth testified then when he went to work offshore, the set was complete. When he returned to his apartment on April 19, the largest knife was missing.
Derrick Hodge testified that in April of 2000, he was living with Sheryl and Garth Miles in their apartment. He was there with his girlfriend, Sherelle Woods, on the evening of April 17, when defendant arrived.[3] Derrick said that he knew defendant to be well groomed in general, but he was unkempt on this occasion. His hair was wild, and he appeared not to have shaved in some time. Defendant told Derrick that he had been down on his luck, that he had no friends, and no place to live. Defendant also informed Derrick that he had a "score to settle."
Derrick testified that he and defendant both slept at the Miles' apartment on the night of April 17, and defendant was there when Derrick awoke on the morning of April 18. As Derrick prepared to go to work, he saw defendant walk out of the kitchen with a knife in his hand. Derrick described it as a black-handled kitchen knife with a ten-inch serrated blade. He identified State's Exhibit 7 as the knife defendant had. According to Derrick, defendant put the knife in his right back pants pocket and left the apartment.
At around noon that day, defendant called Derrick's cellular telephone. He asked Derrick to help him move some furniture and a chair that had blood on it. Defendant also stated that he had to get rid of some blood stained clothes. He told Derrick that he had been in an altercation and that he did not know the condition of the other person.
Derrick returned to the Miles' apartment at about 3:15 p.m. Derrick noted that defendant had bathed, shaved, and changed clothes since he had last seen him. He asked defendant where he had gotten the clothes, and defendant respondent *1101 that they were from a friend. Derrick also noticed scratches on defendant's arms that had not been there earlier.
Marcel Morton testified that when he encountered defendant on April 18, 2000, defendant's hair was unkempt, he was wearing clothes that were too big for him, and he appeared disoriented. Defendant had multiple cuts on his hands. Defendant asked Marcel where he could buy a knife, explaining that he wanted to replace one he had stolen. Defendant asked Marcel how to get blood off of furniture and also asked him to help move some blood stained furniture.
Poppy Nicholas testified that she was romantically involved with the victim, Mark Davis. She stopped at Mark's apartment on her way to work on the morning of April 18, 2000. She was talking with him when someone knocked on the door. Mark went outside and talked with the visitor for about fifteen minutes. Poppy left the apartment shortly after 8:00 a.m., and she saw that Mark's visitor was defendant, Andre Davis. Defendant was standing with his hands tucked under his shirt, and Mark was talking to him in an assertive tone.
Poppy testified that she called Mark on his cellular telephone when she arrived at work. He told her he was still outside talking to defendant. Poppy called Mark again sometime before lunch, and when he answered he told her he could not talk; that he would call her right back. She did not hear from him after that.
Pamela Williams, a forensic scientist in the Jefferson Parish Sheriff's Office Crime Lab, testified that in this case, investigators had dipped sterile swatches of cotton cloth into stains they found at the scene, placed them in sterile vials, and sent them to her for testing. She found that the sample on each of the swatches was human blood. Williams also examined the knife (State's Exhibit 7), and found there was human blood on it. Williams sent several of the items she tested for DNA testing.
Gregory Harrell, a forensic DNA analyst with the Jefferson Parish Sheriff's Office, testified that he received a reference blood stain from the victim, and a reference "buckle swab" from defendant.[4] Harrell testified that blood samples obtained from the floor, chair, table, and entry door in the victim's apartment all matched the victim's reference sample. A blood sample taken from the knife matched the reference buckle swab from defendant.
Dr. Fraser MacKenzie, an expert in forensic pathology, testified that he performed an autopsy on the victim. He determined the cause of death to be multiple stab wounds to the body with perforating wounds to the lung, liver, and stomach. The doctor testified that the wounds penetrated to a depth of two to three inches. Any type of cutting instrument with a sharp edge could have been used to inflict the wounds. MacKenzie believed the blade would have been about four inches long, a size sufficient to cause internal injury and death. He testified that the types of wounds the victim sustained could be made by an instrument such as the knife which was introduced as State's Exhibit 7.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assigned error, defendant challenges the sufficiency of the evidence used to convict him of second degree murder. *1102 Defendant argues that the state produced no direct evidence identifying him as Mark Davis' murderer, and that the state's circumstantial evidence did not establish the elements of second degree murder beyond a reasonable doubt.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291 (per curiam). When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 657. Ultimately, all evidence, both direct and circumstantial, must be sufficient under the Jackson standard to prove guilt beyond a reasonable doubt. Id., citing State v. Rosiere, 488 So.2d 965, 968 (La.1986).
To prove second degree murder in this case, the state was required to show (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1 A(1). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent is a state of mind, and may be inferred from the circumstances and actions of the accused or from the extent and severity of the victim's injuries. State v. Packnett, 04-709 (La.App. 5 Cir. 12/28/04), 892 So.2d 615, 619, writ denied, 05-0599 (La.6/3/05), 903 So.2d 455. In addition to proving the statutory elements of the charged offense at trial, the state is required to prove the identity of the perpetrator. State v. Searls, 04-790 (La.App. 5 Cir. 1/25/05), 895 So.2d 40, 43.
As defendant points out, there were no eyewitnesses to Mark Davis' murder, nor was there any physical evidence linking defendant to the crime.[5] However, despite this lack of direct evidence, we find that the state proved, by strong circumstantial evidence, that defendant was the perpetrator of this crime. The night before the murder, defendant went to the victim's apartment and asked to speak to Tamara Davis, the victim's wife and defendant's former girlfriend. After defendant's encounter with Tamara, the victim told defendant not to return to his home. That same night, defendant told Derrick Hodge, who was also staying at the Miles' apartment, that he had a "score to settle." Sometime between 7:30 and 8:00 the following morning, Derrick Hodge saw defendant exit the Miles' kitchen carrying a knife. Defendant put the knife in his pants pocket and left the apartment. Poppy Nicholas testified that she saw defendant at Mark's apartment that morning before 8:00. She could not see defendant's hands, as they were hidden under his shirt. Mark was talking to defendant in an assertive tone. According to Poppy, the conversation went on for fifteen minutes while *1103 she was there, and it continued until at least the time that she arrived at work and telephoned Mark to check on him.
Moreover, Deputy Ortego recovered a knife from a trash can in a laundry room two hundred feet away from Mark's apartment. It was inside of a Capri Sun drink box like the ones found in the victim's kitchen. Derrick Hodge identified the knife recovered as the one defendant had on the morning of April 18. Garth Miles testified that he owned a set of kitchen knives of the same make as the one found in the laundry room. Garth further testified that the knife in evidence resembled the knife missing from his set. On April 18, defendant asked Marcel Morton where he could buy a knife to replace one he had stolen.
After the murder, defendant told Derrick Hodge that he had an altercation and that he did not know the condition of the other person. Defendant also requested help in moving furniture and a chair with blood on it. Lieutenant English testified that furniture and chairs in the victim's apartment had blood on them. Defendant also said that he had to get rid of some blood stained clothes. In addition, defendant had fresh cuts and abrasions on his hands and arms that were not there the night before the murder. Finally, defendant was seen wearing a shirt given to the victim by Tamara Davis.
We note defendant's argument that there is a psychological affliction that causes depressed individuals to cut themselves. He suggests that as an explanation for the cuts on his hands. Defendant did not, however, present any evidence at trial that he suffered from depression or any other psychological disorder.
Based on our thorough review of the evidence, we find that the state proved beyond a reasonable doubt the elements of second degree murder, including defendant's identity as the perpetrator of that murder. Accordingly, the arguments raised by defendant in this assigned error are without merit.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assignment of error, defendant argues that the trial court erred in allowing the state to elicit from Tamara Davis testimony regarding a threat he made against her on the night before the murder. Defendant contends that the testimony constituted inadmissible other crimes evidence.
Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. LSA-C.E. art. 404 B(1); State v. Prieur, 277 So.2d 126, 128 (La.1973). However, when such evidence tends to prove a material issue and has independent relevance other than showing that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to the exclusionary rule. Evidence of other crimes is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceedings to such an extent that the state could not accurately present its case without reference to the prior bad act. LSA-C.E. art. 404 B(1); State v. Dauzart, 02-1187 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165.
In order for other crimes evidence to be admitted, certain requirements must be met. First, one of the factors enumerated in LSA-C.E. art. 404 B(1) must be at issue, have some independent relevance, or be an element of the crime charged. Secondly, the probative value of the other *1104 crimes evidence must outweigh its prejudicial effect. LSA-C.E. art. 403. Finally, the requirements set forth in State v. Prieur, supra, must be satisfied. State v. Temple, 01-655 (La.App. 5 Cir. 12/12/01), 806 So.2d 697, 709, writ denied, 02-0234 (La.1/31/03), 836 So.2d 58.
Under Prieur, the state must provide written notice to the defendant of the acts it intends to prove, along with the exception to the exclusionary rule upon which it relies. Prieur also requires that the state show, by clear and convincing evidence, that the defendant committed the other crime. LSA-C.E. art. 1104, enacted in 1994, requires that the burden of proof in Prieur hearings in Louisiana conform to that required by Federal Rules of Evidence, Rule 404. The Louisiana Supreme Court has declined to address the question of how Article 1104 affects the burden of proof with regard to other crimes evidence. However, this court has recognized the preponderance of the evidence standard as the burden of proof in a Prieur hearing. State v. Dauzart, 844 So.2d at 165.
On August 1, 2003, the state filed written notice of its intent to use evidence of other crimes, listing three bad acts it planned to introduce at trial. When the matter came on for hearing on December 6, 2004, the prosecutor noted that the state would introduce only the first of the three prior acts listed in its notice:
The evening of 4/17/2000 or early morning of 4/18/2000 the defendant Andre Davis squeezed the back of Tamara Davis' neck and told her if he didn't get what's due to him he would kill her. This incident occurred at 2700 Whitney Avenue, Apt # 21-425.
In the notice, the state alleged that "[t]he purpose of using said crimes is to show defendant's knowledge, intent, guilty knowledge, system and motive." At the subsequent hearing, the state produced one witness, Tamara Davis. She testified that defendant came to Mark's apartment on Monday night and asked to use her card to get onto the naval base. She told him she would not allow him to use her card. Defendant left, but returned three to five minutes later. He brought Tamara around to the side of the building and grabbed the back of her neck. He told her that if he did not get what was due him, he would kill her. Tamara said that when defendant spoke of what was "due him," she believed he meant money. She explained that she and defendant had invested in a show together. She later testified that she thought defendant was talking about the money and her. Tamara testified that defendant did not make the threat in front of Mark, nor did he threaten Mark directly.
The prosecutor argued that the incident was admissible to show motive and intent. She further contended that defendant's threat against Tamara was such an integral part of Mark's murder that it was admissible under the doctrine formerly known as res gestae. Defense counsel responded that a threat against Tamara could not be used to show motive and intent as to the victim. Without giving reasons, the trial court ruled that the prior bad act was admissible. At trial, defendant made a timely objection when the state elicited the disputed testimony from Tamara.
Defendant now argues that the other crimes testimony at issue referred to a threat against a third person, and was not, therefore, relevant to show motive or any of the other factors enumerated in Article 404 B as to the victim's murder. The state counters that the testimony was admissible under LSA-C.E. art. 404 B to show motive and identity. Alternatively, the state argues *1105 that any error in admitting the statement was harmless.
In the present case, we find that the trial court erred in allowing the other crimes testimony. The state did not show a connection between defendant's threat against Tamara and the murder such that it could be used to establish motive or intent for the murder. Defendant did not include Mark in his threat, and the victim was not present when defendant threatened to kill Tamara. Moreover, Tamara did not seem certain about what defendant meant by his threat. Aside from placing defendant at the victim's apartment on the night before the murder, there was little probative value to the testimony. The probative value of the testimony did not outweigh its potential prejudice.
The erroneous admission of other crimes evidence is subject to harmless error analysis. State v. Lyles, 03-141 (La.App. 5 Cir. 9/16/03), 858 So.2d 35, 46. The test for determining harmless error is "whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). In the instant case, we find it unlikely that the jury based its decision on Tamara's testimony about defendant's threat. As discussed in the previous assignment of error, there was substantial circumstantial evidence pointing to defendant's guilt. Defendant was the last person seen with the victim before his death. Defendant was seen shortly after the murder wearing one of the victim's shirts, and defendant asked friends to help him dispose of bloody clothing and furniture.
Based on the foregoing discussion, we find that the introduction of the Tamara's testimony relating to defendant's threat against her was harmless. Accordingly, the arguments raised by defendant in this assigned error are without merit.

ASSIGNMENT OF ERROR NUMBER THREE
In his third assigned error, defendant complains that the Louisiana Supreme Court erred in reversing the trial court's ruling granting him a mistrial.
On December 8, 2004, the third day of trial, the prosecutor questioned state witness Marcel Morton about a telephone conversation he had with defendant on the day of the murder. When asked what the two talked about, Marcel responded, "He talked about, uh, when he was in jail." Defense counsel made an objection and moved for a mistrial on grounds that the testimony constituted inadmissible other crimes evidence. After hearing extensive arguments, the court granted the mistrial motion.
The state objected and noticed its intention to apply for supervisory writs to this court. On December 9, 2004, this court denied the state's writ application, finding "no clear abuse of the trial court's discretion." State v. Andre B. Davis, Writ No. 04-K-1405. The state then applied for writs to the Louisiana Supreme Court. State v. Andre B. Davis, Writ No. 2004-KK-3001. On December 10, 2004, the Louisiana Supreme Court granted writs, reversing the trial court's ruling and denying defendant's motion for mistrial. In doing so, the court reasoned as follows:
We find no substantial prejudice to the defendant where the witness testified that he talked to the defendant "when he was in jail" without a more specific reference to another crime. La.C.Cr.P. arts. 770 and 771. The trial court may admonish the jury if it determines it is appropriate.
Defendant's trial resumed on December 10, 2004. The judge admonished the jury *1106 to disregard the remark made by Marcel Morton. Defendant raised the issue again in a motion for new trial. The trial court denied the motion. Defendant now moves this court to reinstate the mistrial, and to grant him a new trial.
As noted, this issue has already been decided by the Louisiana Supreme Court in a previous writ disposition. At this time, we defer to that court's ruling. A mistrial is a drastic remedy and, except in instances in which it is mandatory, a mistrial is warranted only when trial error results in substantial prejudice to the defendant, depriving him of a reasonable expectation of a fair trial. State v. Falkins, 04-250 (La.App. 5 Cir 7/27/04), 880 So.2d 903, writ denied, 04-2220 (La.1/14/05), 889 So.2d 266. LSA-C.Cr.P. art. 770 provides for a mandatory mistrial when a remark is made by the judge, district attorney, or court official within the hearing of the jury and the remark refers to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible. When such a remark is made by a witness, however, LSA-C.Cr.P. art. 771 provides that a mistrial is not required, if the court is satisfied that an admonition to the jury is sufficient to assure defendant a fair trial.
In the present case, the remark about defendant being in jail was made by a witness and did not trigger the mandatory mistrial provisions contained in LSA-C.Cr.P. art. 770. Moreover, it cannot be said that this testimony even constituted a reference to another crime committed or alleged to have been committed by defendant. The witness merely testified that he talked to defendant about "when he was in jail," and he did not make a specific reference to another crime. See State v. Scott, 34,949 (La.App. 2 Cir. 1/25/02), 823 So.2d 960, writ denied, 02-1622 (La.5/16/03), 843 So.2d 1122, where the Second Circuit held that a remark made by the victim's mother while testifying to the effect that defendant went to jail did not warrant mistrial. The court noted that the response by the witness was not a reference to another crime committed or alleged to have been committed by defendant.
Moreover, even assuming that this testimony was improper, any error in its admission could be deemed harmless. Considering the substantial amount of evidence at trial as a whole, we find that the guilty verdict was clearly unattributable to the statement made by this witness. Based on the foregoing discussion, we find no merit to the arguments raised by defendant in this assigned error.

ERRORS PATENT DISCUSSION
We have also reviewed the record for errors patent, in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). We note that while the commitment indicates that the trial court advised defendant of the two year prescriptive period for applying for post-conviction relief pursuant to LSA-C.Cr.P. art. 930.8, the transcript does not so reflect. Generally, when there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La. 1983). Thus, the trial court is hereby instructed to inform defendant of the two year prescriptive period by sending written notice to defendant within ten days of the rendition of this opinion and to file written proof in the record that defendant received such notice. State v. Boss, 03-133 (La.App. 5 Cir. 5/28/03), 848 So.2d 75, 79 writ denied, 03-1968 (La.5/14/04), 872 So.2d 508.
Accordingly, for the reasons set forth herein, we affirm defendant's conviction *1107 and sentence and remand the matter with instructions.
CONVICTION AND SENTENCE AFFIRMED, REMANDED WITH INSTRUCTIONS.
NOTES
[1] After his arraignment, defendant filed a notice of defense based on mental condition and a motion to appoint sanity commission to determine competency to stand trial. Following a hearing in September of 2001, the trial court found that defendant was not competent to stand trial and ordered that he be committed to a mental health hospital. Over a year later and after other sanity hearings, defendant was found competent to proceed to trial.
[2] The transcript of a pre-trial motion hearing indicates that defendant asked to borrow her "card." However, the trial transcript shows that he wanted to borrow her car.
[3] Sherelle Woods testified that while she was at the Miles' apartment on April 17, she heard defendant going through drawers of utensils in the kitchen. She also heard defendant telling someone over the phone that he was in Mississippi.
[4] Harrell testified that a buckle swab is a sterile cotton swab on which is collected skin cells from the inside of the subject's mouth.
[5] Lieutenant English testified that the victim's apartment was not dusted for fingerprints. Only the Capri Sun box in the kitchen cupboard was examined for prints. To his knowledge, no usable print was found on the box. English commented that police are only rarely able to obtain good fingerprints at a crime scene, and that he has never solved a homicide case based on a fingerprint.