Judgment rendered November 20, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,915-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                              Appellee

versus

JIMMY LYNN KEEN                                 Appellant

* * * * *

Appealed from the
Eighth Judicial District Court for the
Parish of Winn, Louisiana
Trial Court No. 45,363

Honorable Anastasia Stacy Wiley, Judge

* * * * *

LOUISIANA APPELLATE PROJECT              Counsel for Appellant
By: Paula Corley Marx

RICHARD CHRISTOPHER NEVILS              Counsel for Appellee
District Attorney

STEVEN D. CREWS
Assistant District Attorney

* * * * *

Before HUNTER, MARCOTTE, and ELLENDER, JJ.

MARCOTTE, J.

This criminal appeal arises from the Eighth Judicial District Court, Parish of Winn, the Honorable Anastasia Wiley presiding. Defendant, Jimmy Lynn Keen, was convicted of manslaughter and sentenced to 40 years at hard labor, with 25 years suspended, and 5 years of probation. For the following reasons we affirm defendant's conviction, vacate his sentence, and remand for resentencing.

## FACTS AND PROCEDURAL HISTORY

On April 13, 2022, Jimmy Lynn Keen was charged by bill of indictment with second-degree murder, in violation of La. R.S. 14:30.1. The crime occurred on March 16, 2022, and the victim was Thomas K. Spillers, Jr. ("Spillers"). Keen pled not guilty. On October 21, 2022, Keen filed a motion for a speedy trial, and following the empaneling of a 12-member jury, a trial was held February 13-16, 2023, where the following evidence was adduced.

Lacey Moody ("Moody") testified that she had been friends with Keen for about four years. She stated that the relationship was not romantic, and Moody dated Spillers during her friendship with Keen. Moody stated that on the day of his death, Spillers had been drinking all day, starting in the morning. Moody said that she would not have been surprised if a toxicology screen for Spillers showed the presence of methamphetamines in his system. Moody testified that, on the day he died, she told Spillers he should not drive due to his intoxication.

On March 16, 2022, Spillers, Moody, and Spillers' son, Tristen Spillers ("Tristen"), completed errands and, while driving home around 4:30 p.m., they saw Keen and Howard Marshall Smith ("Smith") in the yard of

Smith's home; Keen lived with Smith. The home was located on the same block as Spillers' residence. Spillers got out of the vehicle, while Moody stayed in the car with Tristen. Keen and Spillers had a verbal altercation, and Keen pulled out a knife. Moody said Keen was threatening Spillers with the knife, and she was trying to get Spillers back in the car. Spillers returned to the car, and they went home. Spillers' mother, Kathy Price ("Price"), came to the house and left with Tristen. Moody tried to calm Spillers. Moody testified that she took the screwdriver Spillers used to start his car because she feared what Spillers might do given how upset he was.

Moody said that Josh Allwell ("Allwell") arrived at Spillers' home on a dirt bike around 6 p.m. and said something about Smith, which made Spillers mad again. Spillers used Allwell's dirt bike to drive to Smith's home. Moody heard them "start screaming," so she followed Spillers in his car. Moody could clearly hear someone screaming after Spillers left his house, but she was not sure who it was. When she arrived at Smith's residence, she saw Keen covered in blood and standing over Spillers' body. Moody had not seen Spillers with a weapon, and she did not see a weapon near his body. She stated that the first thing she heard Keen say was, "It's self-defense." Moody contacted the police.

Lieutenant Charles Curry ("Lt. Curry"), of the Winnfield Police Department ("WPD"), testified that he responded to a call around 9 p.m. on March 16, 2022, that a man had been stabbed at 401 North Saint John Street in Winnfield, Louisiana. He arrived within a few minutes of receiving the call. He could tell that Spillers was deceased by the condition of his body and the fact that he could see that he had lost a lot of blood. Lt. Curry observed a puncture wound in Spillers' chest. Lt. Curry took Keen into

2

custody. Lt. Curry said that Keen began to speak with him at the scene, but he stopped him, informed him of his *Miranda* rights, and then took his statement.

Keen told Lt. Curry that he threw the knife somewhere in the house after stabbing Spillers. Lt. Curry found the knife, which he described as a "butcher's knife" or "chef's knife." The knife was eight inches long. He also collected a cloth or old shirt Keen said he used to try and stanch Spillers' bleeding.

Lt. Curry said that Keen told him Spillers had a two-by-two with him, which he later described as a piece of wood. Lt. Keen found the handle of a posthole digger near the door to the house, which Smith later said belonged to him. The handle weighed about three pounds. Lt. Curry said that no other witness told him Spillers was armed with anything that could be used as a weapon.

Lt. Curry testified that Keen told him that he was sitting on the couch in the living room when Spillers "busted in the front door and he had to defend himself from the stick." Lt. Curry stated that he did not observe any defensive wounds on Keen. He said Keen did have a cut on his finger, which appeared infected, and which Keen said happened while he was sharpening a knife. Lt. Curry said that he examined the front door to 401 North Saint John Street and did not see that anyone had broken in or forced the door open. He said that the police were familiar with that house and that the door did not shut or lock properly.

Lt. Curry said he did not look for signs of a struggle inside the house, but he stated that he would not have noticed if there was a struggle because the house was extremely messy. He said he did not see anything that

3

indicated a struggle at the front door. The only blood he observed inside the house was on the knife used to stab Spillers. There was blood splatter in the doorway of the home and on the porch and porch railing. Spillers' body was located 36 feet from the porch; he was lying on his back.

A video recorded by Lt. Curry's body camera of the crime scene was played for the jury. In the video, Spillers was lying near a tree in the front yard of the house. He had a large stab wound to his chest, blood around his mouth, and a pool of blood beside his body. The video showed that there was blood on the porch near the front door, as well as on the porch railing. No blood could be seen inside the house.

Lt. Curry verified that Smith and Jacob Kelly ("Kelly"), another witness, were about one block away when the incident occurred.

At the police station, Lt. Curry again read Keen his *Miranda* rights, and Keen signed a form stating he understood his rights. Lt. Curry then interviewed Keen. The video recorded by Lt. Curry's body camera of Keen giving his statement was played for the jury. Keen admitted to stabbing Spillers, stating that the victim forcibly entered his home and swung a piece of wood at him. One of Keen's fingers appeared swollen, but Keen had no other visible marks or cuts on his person.

On cross-examination, Lt. Curry said that Keen informed him that Spillers swung the handle at him from the doorway, which he said was impossible considering the length of the handle and the height of the doorway. Lt. Curry stated that the doorway was seven feet tall, and Spillers could not have swung a two-by-two overhead, (as he initially told Lt. Curry) without hitting the door frame. Lt. Curry said Keen later changed his statement, saying that Spillers poked or shoved the handle toward him. In

4

Lt. Curry's opinion, that would have been difficult considering how the knife would have hit Spillers.

Lt. Curry said that he did not know if Spillers went into the house, but the violent altercation between Keen and Spillers did not occur inside the house. Lt. Curry confirmed that Spillers was stabbed at night and that the house at 401 North Saint John did not have any electricity, making it dark inside. He processed the crime scene with a flashlight. Lt. Curry said that there was blood in the doorway of the house, but no one photographed it.

Lt. Curry said that according to Keen he was sitting on the couch when Spillers came in the door. The door was 31 feet from the couch. Lt. Curry testified:

> Now, at the point, would a reasonable man walk 31 feet to somebody that's waving a stick at him? There had to be some intent there. And his own … interview where he stated he had the knife in his hand because he was sharpening it. And, of course, we go[t] information later from other witnesses that he had made the statement that he wanted to kill Mr. Spillers. So, all that played into the second-degree charge.

Lt. Curry testified that Keen told him that Spillers was throwing trash cans and waving a two-by-two in the yard, which Lt. Curry said was different from the handle for the posthole digger.

Lt. Curry submitted the handle to the crime lab for DNA analysis about seven months after Spillers' death. He said that length of time was common, given the number of murder cases WPD had that year. The crime lab did not perform any analysis of the handle, the knife, or the buccal swabs obtained from Spillers' body. Lt. Curry said that based on his interpretation of the crime scene, Spillers was stabbed at the doorway, backed up and leaned over the porch rail, and then walked down the steps to where he

5

collapsed in the yard. No other witnesses saw the interaction between Keen and Spillers.

Deputy Stacy Johnson ("Dep. Johnson"), of the Winn Parish Sheriff's Office, testified that she was called to the scene of Spillers' death. She confirmed Lt. Curry's description of finding the knife and bloody shirt, which were located inside the house, about 20-25 feet from the door, and finding the posthole digger handle near the door of the home. She said she noticed blood droplets in the doorway of the house. Dep. Johnson said that she had been to 401 North Saint John Street a few times before and that forced entry into the home was easy to accomplish given the state of the door and its lock. Dep. Johnson testified that there was a lot of blood located around the porch railing of the house. She said it appeared that after Spillers was stabbed, he went to the porch railing, slumped over it, and walked out into the yard, where he fell. There was also a large pool of blood where Spillers fell.

Off. Zilliah Moody ("Off. Moody"), of the WPD, testified that she was called to the scene where she observed that Spillers was deceased. Off. Moody stated that Keen came around the corner, with his hands up, apologizing, saying it was self-defense, and stating that the weapon was in the house. Off. Moody noticed that there was blood in the yard, most of which was where Spillers' body lay, about 36 feet from the porch. She said there was also blood on the porch and the entryway to the house.

Dr. Frank Peretti ("Dr. Peretti") testified via Zoom as an expert in forensic pathology. Dr. Peretti performed the autopsy on Spillers. Dr. Peretti explained that Spillers had a scrape on the left side of his face, a defense-type wound on his right hand, and a single stab wound to his right,

6

upper chest that passed through a rib and terminated in his right lung. The depth of the wound was four to five inches from the front of Spillers' body, and the knife traveled from left to right and downward. Dr. Peretti stated that the stab wound could not have been accidental because it went completely through Spillers' rib, which required an "extremely sharp knife and a lot of force." He testified that the abrasion to Spillers' face was consistent with him falling on his face.

Spillers' toxicology report was admitted and showed the presence of alcohol, methamphetamine, amphetamine, and marijuana in his blood at the time of his death. Dr. Peretti said that Spillers' BAC was .199 and the level of methamphetamine in his blood was 920g/mL, which meant that Spillers injected methamphetamine within 24 hours of his death. He described the level of the drug in Spillers' system as "high."

Carroll Funk, Jr. ("Funk") testified that he knew Keen and would hang out at Smith's house when Keen was present. Funk also knew Spillers but was not present when he was stabbed. Funk said that the day before Spillers died, he heard Keen say that he was going to kill Spillers, saying he was going to "cut his fucking throat." Funk stated that he saw Keen on March 16, 2022, and Keen again threatened to kill Spillers. Funk testified that when he saw Keen at Smith's residence, he had several knives, including a butcher knife.

Smith testified that he lived at 401 North Saint John Street and Keen lived with him in March 2022. Smith also knew Spillers and Moody because Spillers lived on the same block as him. Smith was in the process of moving out of the house on the day Spillers was killed. On March 16, 2022, early in the day, Spillers and Moody drove to Smith's house. Moody

went in the house and asked Keen for money.  Moody and Spillers left without incident.  Smith said that around midday he heard an argument in his front yard between Spillers and Keen.  Smith broke the argument up and Spillers left.

Smith said that Spillers later returned to the house on a dirt bike.  He saw Spillers in his yard "just tearing up shit."  Smith said that Spillers was breaking a two-by-four in the yard, but he did not see Spillers use the two by four on Keen.  He did not see Spillers carrying a stick.  Smith said he did not witness the stabbing because he left to transport some of his belongings to a neighbor's house.  Smith heard Spillers and Keen from the neighbor's house; he said it sounded like "they was tearing the house in half."  He ran to his house and saw Spillers walking in the front yard toward the minibike.  Smith called the police station but was placed on hold, so he ran to a neighbor's house and told them to call 911.  When Smith returned to his house, the police were there.

Smith said that Keen "would play with knives."  He testified that he believed Kelly was in the house when Keen stabbed Spillers, but Kelly told Smith he was locked in his room at the time.  Smith said when he heard Spillers and Keen from the neighbor's house, "It sounded like the house was rattling.  I mean, they had to be in the house."

Tristen testified that he was 13 years old at the time of trial.  Tristen verified Moody's testimony about the pair being in the car with Spillers when they drove past Smith's house.  Tristen said that Keen said something to Spillers, who stopped the car and got out.  Spillers and Keen argued, Keen pulled out a knife, Spillers backed up, got back in the car, and they went to Spillers' home.  Tristen said he was scared and crying, so he texted his

mother, who contacted Price, who picked him up. Tristen identified Keen in court. Tristen said that his father did not have anything in his hands during the encounter with Keen. The state rested.

Kelly testified that he heard the incident resulting in Spillers' death, but he did not see it. He said he was in a separate room of the house at the time and knew there was going to be a fight. He heard a disturbance and the noise of things crashing around, but no voices. He was certain that the commotion came from inside the house. He left the house, saw Spillers' body, and went to get Smith.

On cross-examination, Kelly was asked about the statement he gave to Lt. Curry at the scene, in which he said he was not at Smith's house and did not see anything. Kelly said, "Well it's kind of the same thing because whether I was in the house or in the spot that I said I was, I would have heard all that loud noise regardless and … it still would have played out the same." Kelly stated that he saw Spillers walk to Smith's house and saw him breaking windows, but he did not see Spillers enter the house. When asked about which windows Spillers broke, Kelly said there were a lot of loud noises and stuff being thrown at the house, but he did not identify which windows were broken. Kelly clarified that he heard what sounded like glass breaking, which could have been Spillers throwing things around, such as trash cans.

After being informed of his right to remain silent, Keen elected to testify in his own defense. He stated that he lived at 401 North Saint John Street on the date of Spillers' death. He testified that Moody came to his house on the morning of March 16, 2022, to borrow money to buy drugs. Keen denied her request. Keen testified that he told Moody he was done

"messing" with her. She told him to "come out into the yard and state it." Keen said that he told Moody that his problem was with her and not Spillers. Keen said that Spillers did not exit the car at that time.

Keen said that a few minutes later, Spillers and Moody returned. Spillers got out of the car and Moody remained inside. Keen said that Spillers came onto the porch of Smith's home; the door was open. Keen said that Spillers threatened him. Keen testified that he told Spillers to leave him alone. Spillers left, but he and Moody made several passes by Smith's house in their car. They left but drove by slowly a little bit later. Keen said that Smith said something as they drove by. Spillers stopped the car and got out. Keen said Spillers was cursing at him. Keen exchanged words with Spillers, Moody got Spillers back in the car, and they left.

Keen stated that Spillers returned and he appeared to have a knife with him. Keen testified that Spillers tried to stab Smith's dogs because they were barking at him. Smith told Spillers to leave, and he did. Keen said that his friend, Patrick Carroll ("Carroll"), came over. Spillers returned on the bike. Carroll said that he did not want to be a part of what was happening and left. Keen testified that Spillers was in the yard threatening to kill him. Keen said that he repeatedly told Spillers to go home and that he closed the door. He did not lock the door because he knew Smith would return, and the only way to lock the door was with a sliding bolt.

Keen said Spillers opened the door and came into the house. There was no electricity in the house, and Keen said he could not see well. Keen had some lit candles on the coffee table, but they did not provide much light. Keen stated that Spillers was screaming that he was going to kill him. Keen testified that he went to the door with a knife, and it was then that he saw

10

that Spillers had something in his hand which he swung at him.  Keen said

the first time Spillers swung, he was able to duck, and Spillers missed him.

The second time, Keen said he had his hands up to protect his face and

Spillers hit him on his hand.  Keen said the Spillers "had it in a spear-like

motion trying to stick me in the face," which he was able to avoid.  Keen

then said:

> He kept trying  - - and finally I got down, I came up and
> knocked his hands up, when I did I hit him in the chest with
> both hands trying to knock him back out the door or get him out
> that way, but get him out of my face and feel like that's when
> the knife got him because he stopped talking, he looked at me,
> he did an immediate about face, went toward the door, dropped
> the stick, went out the door, hit the railing, uh, I'm assuming
> that's when the blood went everywhere cause I didn't have a
> flashlight I couldn't see, and he straightened up, he made a
> complete circle, went down the steps, made a right hand turn
> right there past the bushes and everything and then went face
> first in the ground.

Keen said he then realized Spillers was injured, so he rolled him over

and saw his wound.  Keen stated that he ran back into the house, dropped the

knife, grabbed a rag, and ran outside to put pressure on Spillers' wound.

Keen stated that he did not have a phone and screamed for help.  Moody

showed up and, upon learning that Spillers was dead, began to scream.  He

asked her to get help, and she left.  Keen said Price showed up with a gun

and told Keen she was going to shoot him.  Keen said he ran to a neighbor's

house to find Smith, whom he asked to call the police.  Smith said he could

not because his phone was not charged.  It was then that the police showed

up, and he returned to the house.  He was restrained and arrested.

On cross-examination, when asked why Lt. Curry said that he did not

see any defensive wounds on him, but only saw an infected wound on his

hand, Keen said that Spillers hit him directly on the wound on his hand,

causing the scab to break open and for the wound to start oozing. Keen again said that he did not realize that he had stabbed Spillers until he saw him in the yard with blood running under him. The assistant district attorney asked Keen about Dr. Peretti's testimony that severing a rib and puncturing a lung could not be accidental. Keen said:

> I'm saying my adrenaline was pumping so hard and everything was happening so fast, that I did not know I had stuck the man. I just tried to get him out of my face and I … hit him hard. I did, but I did not know that I have caught him with the blade. I swear I didn't. But, like I said, my adrenaline was pumping and everything was happening and it was happening like super fast. This whole incident from between him coming in the door and what happened out in the yard, I feel like was probably somewhere not much more than around 30 - - 30, 45 seconds.

Keen said that he did not know Spillers prior to the day he stabbed him. Keen affirmed that he had a prior conviction for simple burglary and was sentenced to eight years. After serving his sentence, he met Moody, with whom he said he fell in love. He described their relationship as solely a friendship. Keen said Moody had drug-related problems and had asked him for money before. He said that he purchased a truck for Moody. Keen affirmed that it bothered him that Moody did not return his affections. He said Moody dating other men did not concern him, but seeing some of those men mistreat her troubled him.

Keen said that he had physical problems as a 53-year-old man who worked in the oil fields, including only about 40 percent use of his hand. He said he was 6 feet tall and weighed 168 pounds when he was arrested for Spillers' death. Keen said he did not remember saying he was going to kill Spillers. Keen said he pulled a knife on Spillers earlier in the day because he was hoping to scare him.

The posthole digger handle and a photo of it leaning against a door were admitted, and Keen stated that it was a little over four feet long. Keen said the handle was on the front porch, leaning against the wall of the house before Spillers picked it up and swung it at him. Keen testified that Spillers dropped the handle after he stabbed him. Keen said Spillers was in the house when he stabbed him, but he did not have an explanation as to why there was no blood in the house. The defense rested.

The state reopened its case and called Carroll to testify. Carroll stated that on March 16, 2022, he was at Smith's house with Keen, who was using his cell phone. Spillers drove by the house with Moody and Tristen, saw Keen, stopped his car, and got out. Carroll stated that Spillers appeared drunk and said to Keen, "Hey, man, what ya doin' texting my girl for?" Keen and Spillers exchanged words and Spillers left. He later said that Keen did not say much to Spillers during that altercation. Carroll said he did not see anyone with a knife at that time.

Spillers later returned on a bike, and Carroll testified that he pointed him out to Keen from inside the house. Carroll said he spoke to Spillers from inside the house, telling him that he was the person exiting the house. Carroll said that he was concerned because Spillers could have been armed, and the house was dark; he did not want Spillers to hurt him believing him to be Keen. Carroll did not testify that he saw Spillers with a weapon. Carroll said that Smith told him to leave, which he then did. Carroll affirmed several times that Keen had a cell phone and was using it shortly before Spillers was stabbed. Carroll said that Keen had a knife with him when Spillers returned to Smith's house. The state rested.

During closing arguments, defense counsel, James Calhoun ("Atty. Calhoun"), said, while discussing the posthole digger handle, "Not only that, it's been wrapped up in a bag, I guess, for nine months. The defense doesn't have access to it." Atty. Calhoun later said about the handle, "I asked the officer, 'When was this submitted?' 'October 7, 2022,' over six months after the homicide and of course, we now have no results. So, we don't know if there's DNA on the … stick showing it was … being used or being wielded by the decedent."

Assistant District Attorney Christopher Nevils ("Atty. Nevils") said the following during the state's rebuttal:

> There's also, afforded to a defendant in a criminal case, the right to a speedy trial. We have like Detective Curry said, we've got at least four pending murder cases and we've got hundreds other felony cases, and it doesn't give me any pleasure for anybody that's detained pretrial to have to stay in jail waiting on their day in court. And in fact, nothing bothered me more than when we were in Covid and there are some folks that should have gotten out and as soon as they cleared that up, as soon as we got through this pandemic and we could start having trials again, we did and we had four criminal jury trials last year, but the criminal code allows a defendant, if he wants to, to certify that he's ready for trial and he wants to go to trial. So, that motion was filed and that's why we're here today, for trial. That being said, when we have to do that, we had to get some evidence back from the crime lab.

Atty. Calhoun objected, arguing that Atty. Nevils claimed the reason the state did not have more evidence was because Keen made a demand for a speedy trial. Atty. Calhoun then moved for a mistrial. Atty. Nevils responded:

> I don't know of any case or law that says I can't reference a motion for a speedy trial any more than I can reference his request for discovery or any other motion that's been filed. I don't see the basis for a mistrial on that…. I'm not saying he's right or wrong for making his motion for a speedy trial, but I didn't even mention the three letters, D N A. He brought it up to suggest to this jury that we didn't test this evidence as to

14

somehow say that we are hiding evidence from this jury. And I'm entitled to explain why.

The trial court denied the motion. The trial court later said in its jury instructions:

> The statements of the state and of the defense attorney are not to be considered by you as evidence. The attorneys have argued their interpretation of the law, the facts they think have been proven from the evidence and from inferences based on that evidence, and on their conclusions from their interpretation of the law and the facts. These opposing viewpoints are presented to you in argument by the attorneys to assist in your deliberations. However, the statements of the attorneys must be separated by you from evidence admitted in this case.

The trial court also instructed the jury about the justifications and duty to retreat found in La. R.S. 14:20. The jury found Keen guilty of the responsive verdict of manslaughter. The jury was polled, and the verdict was unanimous. The trial court ordered a presentence investigation report ("PSI"). Keen filed a motion for a new trial, arguing his killing of Spillers was justified and that the state's closing argument was not confined to the evidence admitted, making the same claims he made in his motion for a mistrial. Following a hearing, the trial court denied the motion for a new trial.

On August 7, 2023, Keen was sentenced. The trial court noted that Keen showed remorse at the scene of Spillers' death and during his testimony. Spillers' family provided a statement saying that he went to Keen to confront him about stalking and harassing Moody. The trial court provided Keen's criminal history and considered the factors found in La. C. Cr. P. art. 894.1. The court sentenced Keen to 40 years at hard labor, with 25 years suspended, and 5 years of probation. Keen was given credit for time served. The trial court noted that manslaughter is a crime of violence

15

and imposed court costs on Keen. The trial court then stated, "You are advised that you have a right to post-conviction relief and that you have two years after your sentence is final to make an appeal."

Keen filed a motion to reconsider sentence arguing that his sentence was excessive. Following a hearing, the motion was denied. Defendant now appeals.

## DISCUSSION

*Sufficiency of the Evidence*

In his first assignment of error, Keen argues that he proved that he reasonably believed he was in imminent danger of losing his life or receiving great bodily harm when he stabbed Spillers. Keen claims that he had a right to be in his home and had no duty to retreat under La. R.S. 14:20. He states that Spillers, who was under the influence of methamphetamines, alcohol, and marijuana, was the aggressor in their encounter; he pushed his way into Keen's home and swung the posthole digger handle at him.

Keen asserts that multiple witnesses testified that they heard a loud commotion before he stabbed Spillers, and Smith testified that Spillers was in the yard throwing things around and trying to break a two-by-four. Moody testified that when she, Spillers, and Tristen were returning to their home and Spillers got out of his car to confront Keen, she had to make him get back into the car. She also testified that she tried to prevent Spillers driving his car to confront Keen again. Keen argues the evidence presented shows that he killed Spillers in self-defense.

The state argues that it proved beyond a reasonable doubt that Keen stabbed Spillers after being repeatedly provoked. The state also maintains that the evidence was insufficient to show that Keen was justified in killing

16

Spillers.  The state claims that Keen's testimony was inconsistent with his initial statement to the police and there was overwhelming evidence that Keen intended to kill Spillers.

The state points out that multiple witnesses testified, but it was only Keen who claimed that Spillers held a stick.  The state argues that this is not a "stand your ground" type of case because the parties knew each other and had exchanged words earlier that day.  Keen made his intentions of stabbing Spillers clear.  The state argues that the record is replete with testimony that defendant was sufficiently provoked to warrant a lower grade of homicide. The state contends that the jury made a credibility determination and found that Spillers was not killed in self-defense.  The state asks that this court affirm Keen's conviction.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004).  This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.  *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness.  *State v. Casey*, 99-0023 (La. 1/26/00),

17

775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000); *State v. Ramsey*, 55,491 (La. App. 2 Cir. 2/28/24), 381 So. 3d 308, *writ denied*, 24-00379 (La. 10/1/24), __So. 3d__, 2024 WL 4355004. The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Ramsey, supra*. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156.

La. R.S. 14:31(A)(1) states that manslaughter is:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.

"Sudden passion" and "heat of blood," which distinguish manslaughter from homicide, are not elements of the offense, but mitigatory factors exhibiting a degree of culpability less than is present when the homicide is committed without them. *State v. Tompkins*, 403 So. 2d 644 (La. 1981); *State v. Ramsey, supra*. Provocative acts held to rise to the level of mitigating conduct involve physical threats or actions on the part of the victim. *State v. Heard*, 22-378 (La. App. 3 Cir. 11/23/22), 353 So. 3d 326, *writ denied*, 22-01829 (La. 4/18/23), 359 So. 3d 508. Mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter. *State v. Mitchell*, 39,202 (La. App. 2 Cir. 12/15/04), 889 So. 2d 1257, *writ denied*, 05-0132 (La. 4/29/05), 901 So. 2d 1063.

18

La. R.S. 14:20 states in pertinent part :

A. A homicide is justifiable:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
….

(4)(a) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40) when the conflict began, against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the dwelling, place of business, or motor vehicle.
….

B. For the purposes of this Section, there shall be a presumption that a person lawfully inside a dwelling, place of business, or motor vehicle held a reasonable belief that the use of deadly force was necessary to prevent unlawful entry thereto, or to compel an unlawful intruder to leave the dwelling, place of business, or motor vehicle when the conflict began, if both of the following occur:

(1) The person against whom deadly force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered the dwelling, place of business, or motor vehicle.

(2) The person who used deadly force knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred.

C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.

D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.

In any criminal proceeding in which the justification of self-defense is raised pursuant to R.S. 14:19 or 20, the state shall have the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense. La. C. Cr. P. art. 390(A). In determining whether a defendant had a reasonable belief that the killing was necessary, factors that may be considered include the excitement and confusion of the situation, the possibility of using force short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Lensey*, 50,242 (La. App. 2 Cir. 11/18/15), 182 So. 3d 1059, *writ denied*, 15-2344 (La. 3/14/16), 189 So. 3d 1066. The question on a sufficiency of the evidence review is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in the defense of others. *Id.*

We find that the evidence was sufficient for the jury to convict Keen of manslaughter. The jury was given instructions about justifiable homicide and Louisiana's "Stand Your Ground" Law. Keen admitted that he stabbed Spillers. The jury was free to accept or reject Keen's testimony that he acted in self-defense, and the jury members chose not to give credence to what he said on the stand. Furthermore, the physical evidence did not align with Keen's statements about what happened between himself and Spillers. The only blood found in the home was on the knife and the bloody rag Keen said

20

he used to try to stanch Spillers' bleeding. The remaining blood was at the doorway of the home, on the porch, and in the front yard near Spillers' body.

Keen and Spillers had an altercation earlier in the day in which Keen pulled a knife on Spillers, and witnesses said that Keen had threatened that he was going to kill Spillers. The state established and Keen admitted that he was in love with Moody, and Keen said in his statement to Lt. Curry that he often contacted her, gave her money, did her favors, and did not like the men she dated. Lt. Curry said he was skeptical of Keen's account of how he stabbed Spillers because Keen's story changed. First, Keen said that Spillers swung a stick at him, but later he said that Spillers poked the stick at him attempting to hit him with it. Lt. Curry said it would have been very difficult for Spillers to swing the posthole digger handle where his blood was found near the doorway to the house because the doorway was only about seven feet tall, and the handle was about four feet long.

Keen was the only witness to state that Spillers held a stick, and he did not have any defensive wounds. Smith said that Spillers was breaking up a two-by-four in the front yard when he left the house, but he did not see him go to the house with a stick or handle. No other witnesses testified that they saw Spillers with a weapon of any sort or stated that he went inside the house.

Kelly said that the altercation sounded like it was coming from inside the home, but he did not see the exchange between Spillers and Keen. Kelly also gave inconsistent testimony about his whereabouts at the time of Spillers' death and was unable to identify the specific sounds he heard coming from the two men and their actions. Furthermore, Keen said that he wanted to call 911, but he did not have a phone. Keen said that he left the

21

scene to get someone to call an ambulance. He said he asked Smith to call 911, and he responded that he could not do so because his phone was uncharged. Smith, however, testified that he did call 911 and was placed on hold. Also, Carroll affirmed that Keen did have a phone and was using it just before the altercation with Spillers.

Dr. Peretti testified that great force was required to cause the damage done to Spillers' body. The knife cut through Spillers' rib, its path terminated in his lung, and the depth of the wound was four to five inches. Lt. Curry questioned Keen's narrative about the events that led to Spillers' death, and we too find Keen's story suspicious that he traveled more than 30 feet from the couch to the front door to confront a man swinging a four-foot-long handle who had just been breaking things outside and yelling. The state proved beyond a reasonable doubt that Keen did not act in self-defense in killing Spillers.

The jury did find that Keen was provoked by Spillers coming to his home with alcohol and methamphetamine in his system and wreaking havoc in the yard, warranting the responsive verdict of manslaughter. We agree and find the evidence sufficient to uphold the jury's verdict.

*Motion for a Mistrial*

In his second assignment of error Keen claims that the trial court erred in refusing to grant a mistrial when, during closing arguments, the state told the jury that it had more evidence but could not present it because he filed a motion for a speedy trial. Keen argues that closing arguments are confined to the evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the applicable law. The law does not allow the argument to appeal to prejudice and the state's

rebuttal must be confined to answering the argument of the defendant. Keen contends that blaming the lack of evidence on the defense is prejudicial and contrary to the law. He asks this court to vacate his conviction and remand his case for a new trial.

The state contends that the defense knew that the handle was taken into evidence and could have asked the crime lab to test it, but the defense chose not to. Instead, the state argues, Atty. Calhoun suggested that the state hid evidence from the defense and later claimed that the evidence was insufficient because no DNA testing results were available at the time of trial. The state argues that, in filing the motion for a speedy trial, the defense was certifying that defendant was ready for trial. The state maintains that Keen cannot then fault the state when evidence was not returned from the crime lab. The state reasons it was entitled to rebut those errors in defendant's closing argument.

The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state's rebuttal shall be confined to answering the argument of the defendant. La. C. Cr. P. art. 774.

However, even if closing arguments go beyond the scope of La C. Cr. P. art. 774, the errors are harmless unless the reviewing court is thoroughly convinced that the remarks influenced the jury and contributed to the verdict. *State v. Falkins*, 04-250 (La. App. 5 Cir. 7/27/04), 880 So. 2d 903, *writs denied*, 04-2220 (La. 1/14/05), 889 So. 2d 266, 04-2171 (La. 5/20/05), 902 So. 2d 1045. An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely unattributable to

23

that error. *State v. Robertson,* 06-1537 (La. 1/16/08), 988 So. 2d 166; *State v. Campbell*, 46,888 (La. App. 2 Cir. 3/14/12), 86 So. 3d 204, *writ denied*, 12-1059 (La. 10/26/12), 99 So. 3d 641.

The law regarding discretionary mistrials and admonitions is set forth in La. C. Cr. P. art. 771, which provides as follows:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
>
> (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
>
> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

A mistrial is a drastic remedy and, except in instances in which it is mandatory, is warranted only when trial error results in substantial prejudice to the defendant, depriving him of a reasonable expectation of a fair trial. *State v. Campbell, supra.* Whether a mistrial should be granted is within the sound discretion of the trial court, and denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion. *State v. Falkins, supra.*

We find no error in the trial court's denial of Keen's motion for a mistrial. Atty. Calhoun raised the issue of DNA testing of the posthole digger handle in his closing arguments and claimed that the state did not do its due diligence by failing to have it tested. Atty. Nevils responded to the

defense's argument in the state's rebuttal. He did not mention DNA testing but said that Keen had filed a motion for a speedy trial and the state was required to get evidence back from the crime lab to proceed with trial. The trial court also reminded the jury in its instructions that the jury members were only to consider the evidence presented during that trial and that the arguments of the state and the defense were separate from the evidence.

It is difficult for this court to see how Atty. Nevils' remarks regarding a speedy trial influenced the jury and contributed to its manslaughter verdict. There was a surfeit of evidence in this case showing that Keen stabbed Spillers, including Keen's confession to police and his testimony at trial. The posthole digger handle was admitted and presented to the jury along with defendant's testimony. The jury's verdict was not attributable to the state's comments about defendant's motion for a speedy trial. The trial court had wide discretion to grant or deny the motion for a mistrial in this instance, and this court will not disturb its ruling on appeal.

*Excessive Sentence*

In his last assignment of error, Keen argues that the trial court erred in imposing an excessive sentence. Due to an error patent, this court vacates Keen's sentence and remands this case for resentencing. Therefore, Keen's final assignment of error is moot.

*Errors Patent*

A review of the record for errors patent indicates that the sentence imposed upon Keen was illegally lenient. Keen was convicted of manslaughter and sentenced to 40 years at hard labor, with 25 years suspended, and 5 years of supervised probation. The trial court designated Keen's conviction a crime of violence. The court shall not suspend the

sentence of a conviction for an offense that is designated in the court minutes as a crime of violence pursuant to Article 890.3. La. C. Cr. P. art. 893(A)(2). Manslaughter is designated as a crime of violence in La. C. Cr. P. art. 890.3, making Keen's sentence illegally lenient. Since the trial court has wide discretion in the imposition of a sentence within statutory limits, this court vacates Keen's sentence and remands this case for resentencing.

Two other errors patent were found. First, the minutes for Keen's sentencing state that he was sentenced to 40 years at hard labor with 15 years suspended, instead of 25 years suspended as found in the sentencing transcript. Due to the disparity between the minutes of sentencing and the transcript of sentencing, the trial court is ordered to amend the minutes of sentencing to accurately reflect the sentencing transcript.

Second, the trial court failed to properly advise Keen of his post-conviction relief time limits as found in La. C. Cr. P. art. 930.8(A). That article provides that no application for post-conviction relief shall be considered if it is filed more than two years after a defendant's *conviction and sentence* become final. The trial court informed Keen that he has two years to file for post-conviction relief "after your sentence is final." Because this court is vacating Keen's sentence and remanding for resentencing, this final error patent is moot. However, we note that when resentencing the defendant, the trial court should advise him of the proper time limitations provided by La. C. Cr. P. art. 930.8(A) for applying for post-conviction relief.

26

## CONCLUSION

Defendant's conviction is affirmed. Defendant's sentence is vacated, and his case is remanded for resentencing and correction of the minutes as noted herein.

**CONVICTION AFFIRMED; SENTENCED VACATED; REMANDED FOR RESENTENCING.**